**MATLACK, INC.**

v.

**HUPP CORPORATION**

v.

**BUTLER MANUFACTURING CO., et al.**

Civ. No. 35317.

United States District Court, E. D. Pennsylvania.

Oct. 20, 1972.

of $400,000 for an alleged breach of warranty arising from the sale by defendant Hupp Corporation (Hupp) in the Spring of 1959 of certain Hercules CV4 engines.[1] Two of the motions (framed on different grounds) seek summary judgment and a certification by this Court pursuant to 28 U.S.C. § 1292(b) for an interlocutory appeal in the event summary judgment is denied. These motions were interposed in the wake of the filing by Matlack on May 18, 1970, of certain "Amended Answers to Interrogatories" which in essence effected a complete change in Matlack's theory of recovery from oral warranty to written warranty. The remaining motion, framed in the alternative to the summary judgment motions, attacks the Amended Answers to Interrogatories as being untimely filed and asks that they be stricken.[2] The alternative motion asserts that the change in theory is barred by the statute of limitations, but that even if it is not, its late interposition must be proscribed because of its prejudicial effect upon Hupp, its disruptive effect upon the proceedings, and its disharmony with the spirit of the procedural rules. In a final variant, in the event the belated change in theory is allowed, Hupp asks that the Court impose costs (including attorneys' fees occasioned by the delay) as a condition of its allowance.

Although the motion which in our view is the more significant and which concerns us most herein is that which seeks to strike the amended interrogatory answers, Hupp's first response to the amendment was not a motion to strike, but rather the first motion for summary judgment. That motion was predicated upon the contentions that: (1) no express written warranty was ever made; (2) Hupp expressly conditioned all of its

Arthur R. Littleton, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiff.

Oliver C. Biddle, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendant Hupp Corp.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

We have before us several defense motions in connection with this action filed by plaintiff Matlack, Inc. (Matlack) in March 1964, seeking damages in excess

---

1. Hupp Corporation is the successor to Hercules Motors Corporation.

2. While the Complaint is phrased broadly enough to encompass either an oral or

written warranty claim, Matlack had by its responses to discovery questions (see note 4 *infra*) and in its pretrial memorandum narrowed the theory to one of oral warranty.

sales upon a written disclaimer of any warranty of fitness for a particular purpose; and (3) notwithstanding the utterly voluminous record already developed in the matter (depositions, affidavits, answers to interrogatories, etc.), there is no genuine issue of material fact with respect to these matters. In an unreported *Memorandum Opinion* filed on June 4, 1971, we rejected these contentions and denied the motion for summary judgment.

On June 7, 1971, we convened a conference of counsel looking toward a listing of this very old case for trial. At that conference, Oliver C. Biddle, Esq., counsel for Hupp, expressed a desire to reargue the motion for summary judgment and to interpose an additional summary judgment motion grounded on the defense of accord and satisfaction. At that conference, Mr. Biddle also expressed his desire to file the alternative motion to strike the amended interrogatory answers. We granted leave to reargue and to file the additional motions. In due course, reargument of the original motion and argument on the new motions was held, and a variety of supplemental briefs filed.[3] Before turning to the motion to strike, we must dispose of the summary judgment motions which are thus again before us, and, because we will deny them, the request for certification under 28 U.S.C. § 1292(b). It will be helpful, however, to restate the underlying factual background of the case.

Matlack is one of the largest trailer operators in the northeastern United States. In the summer of 1958, it became interested in the prospect of hauling cement in dry or powdered form, as opposed to wet premixed form, from mill to construction site by means of a trailer operation. Theretofore, almost all of such hauling had been done by the railroads. Having determined to embark upon such a venture as the result of having seen a demonstration in the summer of 1958 of a pneumatic trailer built by Delta Manufacturing Company being unloaded by air pressure, Matlack began a search for the right combination of equipment to do the job. Pressure to bring the search to fruition became intense when Matlack contracted for substantial cement trucking business for the year 1959.

The combination of equipment which eventuated was: (1) a new type of trailer designed by Fruehauf Trailer Company, Inc. (Fruehauf) on which was mounted (2) a Miehle-Dexter blower, which in turn was driven by (3) an auxiliary engine, the Hercules engine, manufactured by Hupp. When the Fruehauf trailers were built and delivered to Matlack, the Hupp engine did not perform satisfactorily and eventually had to be replaced, thus causing Matlack monetary damages. Hupp concedes, for purposes of the summary judgment motions, that its engine did not operate satisfactorily; it attributes this to many factors associated with the particular use to which they were put, especially pervasive cement dust and the severity of the operating conditions.

For the first five and one-half years of this lawsuit, and in seven separate written statements of its claim,[4] Matlack

3. At the June 7 pretrial conference, Arthur R. Littleton, Esq., counsel for Matlack, requested additional time to answer certain requests for admissions which had been filed in October of 1970. It then appeared that Hupp's forthcoming motion for summary judgment on grounds of accord and satisfaction rested on matters which Hupp deemed admitted because of Matlack's failure to answer. On account of the engagement of Mr. Littleton in protracted litigation involving a matter of public importance, the Court extended the time for filing of answers to the requests for admissions to July 15, 1971. The answers were in fact filed on June 20, and the Court thereupon accepted them as timely filed. Hupp's accord and satisfaction motion has been briefed and argued on the basis of the answers to requests for admission as thus filed.

4. Matlack's answers to Hupp's interrogatories were filed in five separate installments: the first in December 1965 (dkt. #27); the second in June 1966

represented that its claim for breach of warranty rested solely on words allegedly spoken by Hupp's chief engineer, J. L. Biasetti, to Matlack's vice president in charge of purchasing, E. E. Taylor, at a meeting in Fruehauf's offices in Omaha, Nebraska on February 12, 1959. Under the original statement, Biasetti had assured Matlack representatives and other persons present at the meeting that the Hercules CV4–180 engine was capable of meeting Matlack's requirements, *i. e.*, 3200 rpm and a minimum of 60 horsepower for the use contemplated. However, at some time prior to March 1970 it became clear to Matlack that neither Biasetti nor any other representative of Hupp had attended the Omaha meeting and in due course Taylor and his assistant, Len Seither, who represented Matlack at the Omaha meeting, conceded that neither Biasetti nor any other Hupp representative was there. In the Amended Answers to Interrogatories, Matlack abandoned *in toto* all of its prior allegations and sworn statements concerning the making of an oral warranty and asserted a new theory based upon breach of an alleged express written warranty. By the time this document was filed, Taylor was not only no longer employed by Matlack, but was indeed one of its principal competitors.

There are two documents at the heart of Matlack's newly asserted express written warranty claim. The first document is a letter written by Hupp's salesman, David G. Fleming, to G. N. Ensminger, a Fruehauf product engineer, on January 28, 1959 (hereinafter referred to as the Fleming letter).[5] This letter first recites:

(a) Fruehauf's interest in the CV4 engine with a view to mounting it on a Fruehauf trailer for the purpose of powering a Miehle-Dexter rotary blower for use in a pneumatic conveying system;

(b) Hupp's awareness of the application of the CV4 engine to the Delta experiment; and

(c) Hupp's awareness of the operating requirements for the engine in the proposed application.

It then goes on to quote prices for the engine and its various accessories and to make comments about a delivery schedule for the engines. The second document is a Hupp brochure on the Hercules CV4 engine reciting its performance data, which accompanied the Fleming letter. Both the letter and the brochure were supposedly exhibited to Taylor at the meeting in Omaha on February 12, 1959, following which the decision was made to proceed with the combination of equipment which has been discussed.

The Fleming letter contains two excerpts which are most germane to the motions before us:

A question which you raised during our initial telephone discussion was, "Can the engine be started while engaged to blower?" We talked with our engineers about this who did not want to commit themselves in view of their somewhat *scant knowledge about the application.* We believe you can appreciate their thoughts in this connection, however, they did advise that on the surface there would not appear to be any serious objection to this. It was their opinion that one of our sales

(dkt. #41); a third in July 1966 (dkt. #44); and a fourth in March 1967 (dkt. #48). Matlack's fifth installment (dkt. #56), filed in September 1967, was not forthcoming until after Hupp had moved for default judgment or in the alternative for an order compelling Matlack to submit full and responsive answers (dkt. #53). See also plaintiff's pre-trial and amended pre-trial memoranda (dkt.

#51 & 58) filed approximately four years after this suit was begun.

5. While there is no evidence of direct contact between Hupp and Matlack with respect to the question of the engines, there was extensive contact, however, between Matlack and Fruehauf, and between Fruehauf and Hupp.

representatives should perhaps discuss this application further with you so as to be sure of just what was involved, etc.

.   .   .   .

We wish to take this opportunity to thank for contacting us for *we do believe that we have the engine that will "fill the bill"* in all categories so far as your application is concerned. (emphasis added.)

As will be seen in the discussion *infra,* the real thrust of Matlack's position on the express warranty is that it stems from the combination of the two documents and certain facts antecedent to them. We turn then to a discussion of the various legal issues.

II. *The Motions for Summary Judgment and the Question of Certification Under 28 U.S.C. § 1292(b)*

In our previous Memorandum Opinion we set forth our reasons for finding that there was a genuine issue of material fact for trial on Matlack's claim that Hupp had breached an express written warranty. One reason for our delay in determining these motions (we also encountered unusual pressure from other protracted matters) is that as we reviewed and re-reviewed the voluminous record, it appeared to us from time to time that Matlack's express written warranty claim is so weak, and Hupp's defense on a variety of issues so strong, that the case might well be one for the grant of summary judgment; hence we preferred to ponder it extensively. In the wake of this reflection, however, we still find there to be germane issues of material fact, and it will be for a jury and not for us to determine the merits of Matlack's claim and Hupp's defenses on such issues as are to be tried.

■■ Our analysis of the material issue extant on the warranty question remains essentially unchanged from our original opinion. Hupp argues, and with considerable force, that as a matter of law no warranty, express or implied, can be found from language such as "we do believe that we have the engine that will fill the bill." Hupp is correct that a statement of opinion or belief does not constitute a warranty, Madison-Kipp Corp. v. Price Battery Corp., 311 Pa. 22, 166 A. 377 (1933); and that if the statements in a letter constituted mere opinion or belief or mere dealer's talk or "puffing," no warranty can exist as a matter of law. Marlie Trading, Inc. v. Biggs Boiler Works Co., 112 Ohio App. 428, 176 N.E.2d 301 (1960); Roscher v. Band Box Cleaners, Inc., 90 Ohio App. 71, 103 N.E.2d 404 (1951); Ralston Purina Co. v. Iiams, 143 Neb. 588, 10 N.W.2d 452 (1943).[6] Hupp goes on to stress the fact that the combination of its Hercules engine with the Miehle-Dexter blower in the cement unloading operation was new and therefore untried. Pointing to the reference in the letter to its "scant knowledge about the application," Hupp contends that there could not possibly be any express warranty of fitness for a particular purpose in such a context.

We noted in our original opinion that there is some evidence in the record suggesting that (1) Hupp knew of the use to which the Hercules CV4 engine was to be put, *i. e.,* use in a pneumatic conveying system to power a Miehle-Dexter rotary blower, with the engine-blower combination being used to unload dry cement at construction sites; (2) Hupp was informed of all of the requirements needed for the engine, such as speed, power, the load to which the engine was to be subjected, and the extent of daily use; (3) Hupp was aware that there

---

6. There are three possible choice of law states—Nebraska, the site of Fruehauf's offices and the Omaha meeting; Pennsylvania, the forum state where Matlack's business was conducted; and Ohio, where Hupp's business was conducted and from which the crucial correspondence was sent.

was a prospect of the sale of a thousand engines through this source; (4) while Hupp did not deal directly with Matlack, it knew that what it told Fruehauf about its engines' performance characteristics would be related by Fruehauf to its ultimate customer; and (5) the pneumatic unloading process had been used before in Europe and California.

When we viewed the Fleming letter and its enclosure against the background of Hupp's knowledge (at the time of our first opinion), we could not say that there was no genuine issue of material fact on the question whether Hupp made an express written warranty of fitness in connection with the sale of the engines in question. Mr. Biddle has forcefully urged in his brief sur reargument that there is no evidence of any knowledge on Hupp's part that Fruehauf would disclose the Fleming letter (or any similar preliminary communication between the two companies) to third parties, and that even if it could be inferred from the evidence that Hupp anticipated that what it told Fruehauf about the Hercules engine would be related by Fruehauf to Matlack, then the only fair inference would be that Hupp expected Fruehauf to disclose not just the one Fleming letter, but all communications between the two companies, including: (a) what Fruehauf had said to Hupp about testing a pilot model of the engine (we have noted the experimental nature of the pneumatic unloading operation); (b) what Hupp had written to Fruehauf regarding the shipment of such a pilot model and its hopes; and

(c) its disclaimer (see *infra*) as to the engine's fitness for the application.

We have noted already that the summary judgment motions have not proceeded on the basis of a scant record, and that the depositions, answers to interrogatories, and affidavits filed thus far are indeed voluminous. If we were the trier of the fact, we would be materially moved by Mr. Biddle's observations, recited in the preceding paragraph, as to what Hupp knew about Fruehauf's transmittals to Matlack and what Hupp had reason to expect would be transmitted. However, on the summary judgment issue we cannot say that there is no genuine issue of material fact on these points; hence we turn to the heart of the warranty question. Set against the background of the essentially novel character of the pneumatic unloading arrangement, it seems to us that the statement that the engine would "fill the bill in all categories" makes out a pitifully weak case of express warranty. However, to repeat, the merits are not before us and we still cannot say, in view of the stringent standards for granting summary judgment,[7] that there are no genuine issues of material fact on the issue of the existence of a warranty for trial.[8] Neither are we inclined to change the view expressed in our previous opinion that the disclaimer point is controlled by Greenspun v. American Adhesives, Inc., 320 F.Supp. 442 (E.D. Pa.1970), because of the size and location of the only printed disclaimer Matlack (as opposed to Fruehauf) received in connection with the transaction.

---

7. In viewing a motion for summary judgment, (1) all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, Toebelman v. Missouri-Kansas Pipeline Co., 130 F.2d 1016 (3d Cir. 1942); (2) the moving party has the burden of demonstrating that there is no issue of fact, Fairbanks, Morse & Co. v. Consolidated Fisheries Co., 190 F.2d 817 (3d Cir. 1951); and (3) all inferences to be drawn from the underlying facts must

be viewed in the light most favorable to the party opposing the motion. United States v. Diebold Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

8. Matlack also contends that there is an issue of fact as to whether Hupp possesses superior knowledge of the properties of its engine. *Cf.* Royal Pioneer Paper Box Mfg. Co. v. Louis De Jonge & Co., 179 Pa.Super. 155, 115 A.2d 837 (1955).

Hupp's second motion for summary judgment is based on an alleged release by accord and satisfaction or executory accord. After the failure of the engines, Matlack wrote to Hupp complaining that all of its engine troubles were Hupp's sole responsibility. Hupp denied responsibility. Thereafter, in January 1961, Matlack and Hupp entered into an agreement the purpose of which was to satisfy Matlack's claims. In Hupp's view, Hupp and Matlack exchanged the following promises: (1) Hupp promised to run certain tests on one of Matlack's engine-blower units; (2) Matlack promised Hupp that it would order, and Hupp promised Matlack that it would manufacture and deliver, several new engines at Hupp's regular prices with the stipulation that Matlack could return them for refund "if after six months they had not performed satisfactorily"; and (3) Matlack and Hupp agreed to work together on a list of specific items that might be included by Matlack in a program to rebuild Matlack's used engines, with Hupp to quote its price for each item thus agreed on.

■ Although Hupp contends that it fulfilled its side of the accord, Matlack disagrees with Hupp's interpretation of its promises. More specifically, Matlack submits that Hupp's obligation under the agreement was not merely to prepare a list of specific items that might be included in the rebuilding program, but also to rebuild the engines to the point where they would be covered under Hupp's new engine warranty. There is some indication in the record that the new engine warranty was promised, conditional on Matlack's acceptance of Hupp's full rebuilding suggestions. Under the applicable standards (see note 7 *supra*), with the record in this state, we cannot say that no issues of fact remain on the accord and satisfaction defense; hence, as to it, summary judgment must be denied.

Hupp's argument on accord and satisfaction does not stop with the assertion that it performed its obligations under the accord. It goes further and argues that the accord itself constituted an immediate and complete satisfaction of Matlack's claims. In the present posture of the case we cannot agree. Needless to say, Matlack disputes Hupp's view as to the intention of the parties. Arguing from the proposition that the question of the discharge of the original claims by an executory accord is a matter of the intention of the parties, *Slaughter v. Philadelphia Nat'l Bank*, 417 F.2d 21, 27 (3d Cir. 1969), Matlack asserts:

> It would be inconceivable to assert that Matlack intended to relinquish its substantial claims against Hupp in return for a *promise* on Hupp's part to perform in the future. Matlack intended that the original claims would be discharged *when* the contemplated performance was completed as called for by the accord agreement.

The dangers inherent in making, upon a meager record, a judgment as to whether two parties intend an agreement to be a present release or merely an executory accord were indelibly demonstrated by the opinion of Chief Judge Seitz in *Eulo v. Deval Aerodynamics, Inc.*, 430 F.2d 325 (3d Cir. 1970), cert. denied, 401 U. S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971). We cannot on the record before us determine as a matter of law that the parties had agreed to a present release. Hence the motion for summary judgment based on the executory accord defense must also be denied.

■ Contending that substantial additional discovery must precede the trial in this matter, and noting the arduous nature of trial preparation as well as the possible protracted nature of the trial itself, Hupp has requested that we certify this motion for interlocutory appeal to the Court of Appeals under 28 U.S.C. §

1292(b), which provides, in pertinent part:

> (b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order . . . .

We do not deem denial of a summary judgment motion in a case such as this the stuff of which Section 1292(b) certifications should be made. The questions of law involved are not of unusual importance, either to the substantive law of contracts or the interpretation of the Federal Rules of Civil Procedure. Indeed, the choice of law considerations involved may well lead to the result that the law of either Ohio or Nebraska, both outside the Third Circuit, will control. Finally, we do not perceive that the grant of a Section 1292 certification would "materially advance the ultimate termination of the litigation." This case is already eight years old—the events in question took place some thirteen years ago and the case would be even older when it returned from the Court of Appeals. A number of witnesses have already died (see *infra*), and the recollections of all human beings get fainter with time. Despite the voluminous pretrial record, we are satisfied that the case can be tried in several weeks and that the interests of justice dictate that it be moved to trial in this Court as expeditiously as possible.

## III. *The Alternative Motion to Strike the Amended Answers to Interrogatories*

### A. The Statute of Limitations

The first basis on which Hupp asks that plaintiff's amended interrogatory answers be stricken is that they state a claim barred by the statute of limitations.[9] In Hupp's view the abandonment of the Biasetti-Omaha oral warranty claim and the adoption of the Fleming letter written warranty claim represents not just a change in the theory of the case, but indeed of the operative facts.

■■   Because the complaint is sufficiently broad without amendment to bear evidence on the new written warranty theory, rule 15 of the Federal Rules of Civil Procedure, relating to amendment of pleadings, is not binding here.[10] We hold that the filing of the complaint tolled the statute of limitations with respect to the written warranty theory as well as the oral warranty theory. The adoption of the rules of procedure in 1938 signaled the end of "fact pleading" in federal court and the approval of "notice pleading," Dioguardi v. Durning, 139 F.2d 774 (2d Cir. 1944), with the contemplation that the facts would be developed during discovery proceedings and the theory of the case set forth in the pretrial memorandum. Thus even a change in some of the operative facts of a cause of action does not alter the tolling effect of a well-pleaded but sufficiently encompassing complaint, as was filed in this case. All that is required by rule 8(a), and about all that was furnished here, is "a short and plain statement of the claim showing that the pleader is entitled to relief." The furnishing of that short and plain statement tolled the statute.

---

9. *See* Pa.Stat.Ann. tit. 12A, § 2–725; Ohio Rev.Code § 1302.98; Nebraska UCC § 2–725.

10. Rule 15(c) of the Federal Rules of Civil Procedure provides in pertinent part that "[w]henever the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading, the amendment relates back to the date of the original pleading."

**B. The Question of Prejudice and Disruptive Effect upon the Litigation and the Procedural Rules**

By discussing the motions for summary judgment as to the written warranty claim before the question whether Matlack should be allowed to press that claim at all, we have to some degree put the cart before the horse, although in so doing we have followed the lead of Hupp's counsel, who interposed summary judgment motions as his first line of attack. We turn now to what is, along with the statute of limitations question, the central and perhaps ultimately dispositive aspect of the case.

We have noted several times now that Matlack delayed for six years in asserting the written warranty claim. In support of its alternative motion, Hupp alleges that during the six-year period involved it spent hundreds of hours and thousands of dollars gathering the proof and preparing the papers necessary to obtain summary judgment against Matlack on the merits of the oral warranty claim originally asserted. Hupp further claims that during this entire period Matlack knew or should have known all of the facts that now necessitate the change in theory. Although Taylor has now left Matlack and in fact has become its competitor, Hupp points out that at the time Taylor acted as the principal architect of the complaint against it, he was Matlack's vice president and the official responsible for the transaction involved. Hupp argues forcefully that it was entitled to be informed by Matlack within a reasonable period of time of its theory of action; indeed, that is the whole thrust of the civil discovery rules. Hupp adds that during the six-year period in question it had no reason to, and did not, interview any witnesses or examine any documents except those bearing on the claim originally asserted by Matlack and that today, nearly thirteen years after the events in question took place, it is impossible to say what documents relevant to Matlack's new claim have been preserved and what documents destroyed. According to Hupp, Len Seither, a Matlack representative at the Omaha conference, has since died, as have E. H. Latta, Hupp's vice president in charge of engineering, and Robert Matlack, one of the principals of the Matlack firm.[11] Finally, Hupp submits that those witnesses who are still alive and available will inevitably have a far dimmer and more confused recollection of the relevant facts than would have been the case in 1964.

■ Our power to narrow and define the issues in cases before us stems from F.R.Civ.P. 16, and indeed is central to the federal procedural scheme in civil cases. This power, exercised equitably and to prevent injustice, enables the court to prevent the trial of issues the parties have not pressed in pretrial proceedings. We reiterate in this context Matlack's admission that despite seven separate statements of its claim (see note 4 *supra*) it never raised the claim of written warranty until five and one-half years after the suit was instituted and over eleven years after the events in question, until then always specifying its warranty claim as consisting entirely of an oral warranty allegedly given at the Omaha meeting on February 12, 1959.

■ Although we thus have power to strike the challenged amended answers to interrogatories on the equitable ground that they raise issues long foreclosed by Matlack's own chosen course in the protracted pretrial proceedings, we will not exercise that power, of course,

---

11. In an unrelated matter in which the Matlack interests were heavily involved, this Court noted Robert Matlack's preeminent role on their behalf. *See* In the Matter of Flying W Airways, Inc., 341 F.Supp. 26, 46 (E.D.Pa.1972). In the intervening years, the Matlack brothers (Robert, Brooke, and Edward) sold the trailer and tank truck business involved in the present case to Rollins Leasing Corporation, a large conglomerate.

unless justice so requires. We have drawn guidance in this area from the many cases where the courts had to decide whether to allow very late amendments to pleadings under their discretionary power given by rule 15(a).[12] While technically involving a slightly different issue, these cases were decided on the same considerations of justice that should guide us here, for they all involved a tardy effort to shore up a claim or defense by the alteration of the controlling issues.

In Eisenmann v. Gould-National Batteries, Inc., 169 F.Supp. 862 (E.D.Pa. 1958), in which plaintiffs waited two years (in contrast to the six-year delay involved here) before moving to amend their complaint, Judge Kirkpatrick stated (169 F.Supp. at 864):

> The amendment contains no facts unknown to the plaintiffs . . . at the time the original complaint was filed. . . . Nevertheless the plaintiffs waited nearly two years to move to amend the complaint and then made the motion only after a motion for summary judgment had been filed and argued. The plaintiffs should not be permitted to sit by for this period of time and attempt to bolster up their pleadings in answer to a motion for summary judgment when that motion has not been filed precipitately and when they have had ample opportunity to present their claims to the Court in a timely manner. County of Marin v. United States, D.C., 150 F. Supp. 619, 623.

While noting that a motion to amend after a responsive pleading has been served is addressed to the discretion of the Court, and that rule 15(a) provides that leave shall be freely given when

justice so requires, Judge Kirkpatrick denied the motion, holding that in the circumstances before him, allowance of the amendment would entail useless delay and wasted time.

There are other cases following the Eisenmann rationale. In Albee Homes, Inc. v. Lutman, 47 F.R.D. 258 (E.D.Pa.), aff'd, 406 F.2d 11 (3d Cir. 1969), Judge (now Chief Judge) Joseph S. Lord, III denied plaintiffs' motion for leave to amend their answer to a counterclaim to plead a release, five years after the start of the lawsuit and on the eve of the second trial, where it appeared that the facts forming the basis of the proposed amendment were known to plaintiffs from the commencement of the lawsuit. Judge Lord stated:

> The fact is, however, that defendant would be prejudiced by allowance of the amendment. The case went to trial on the basis of our ruling, since affirmed, that plaintiffs were not entitled to show the release in defense of the counterclaim. In reliance on this ruling, defendant went to considerable effort to litigate the fraud issue on the merits and to obtain a new trial on that issue based upon an error in our charge. To vitiate now that effort by permitting an amendment five years after the start of the lawsuit would, we think, work substantial prejudice to defendant.

47 F.R.D. at 259. In Gaylord Shops, Inc. v. South Hills Shoppers' City, Inc., 33 F.R.D. 303 (W.D.Pa.1963), Judge (now Chief Judge) Rabe F. Marsh, Jr. refused to permit an amendment to plaintiff's complaint 22 days after the final date fixed by him for such action (and fifteen months after the complaint was filed), observing:

12. Rule 15(a) reads as follows:
   (a) Amendments. A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may

so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. . . .

It is our opinion that in antitrust cases, when the recommended extensive and difficult pretrial procedure to particularize specific disputed issues of fact are practically completed, it would be unjust to permit an amendment materially altering the sworn factual basis for the action, particularly when the procedure has revealed that the sworn averments in the complaint are erroneous. If permitted in this case by the untimely motion, additional discovery may be required, additional conferences held, pretrial statements and orders changed. *The pretrial procedure up to this time would be disrupted, and delay, waste of time and money, disorder, prejudice and injustice to the opposing parties would necessarily result.* [citations omitted].

33 F.R.D. at 305 (emphasis added).

The most recent pronouncement by the Supreme Court with respect to rule 15(a) is found in Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). There the Supreme Court upheld the District Court (reversing the Court of Appeals) in rejecting plaintiff's proffered amendment to its answer to a counterclaim to assert the defenses of limitations and release [13] one year after trial. Mr. Justice White, speaking for the Court, stated:

> *It is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court.* Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L. Ed.2d 222 (1962) (dictum). In a matter as substantial and complex as this one, where HRI claimed it had been misled or at the very least asked to be relieved of mistake or oversight, it might have been within the discretion

of the trial judge to have permitted HRI to amend its pleadings to include therein the defenses of limitations and release. *But, in deciding whether to permit such an amendment, the trial court was required to take into account any prejudice that Zenith would have suffered as a result,* see Kanelos v. Kettler, 132 U.S.App.D.C. 133, 136–137, n. 15, 406 F.2d 951, 954–955, n. 15 (1968); United States v. 47 Bottles, More or Less, 320 F.2d 564, 573–574 (CA3 1963); Caddy-Imler Creations Inc. v. Caddy, 299 F.2d 79, 84 (CA9 1962); 3 J. Moore, Federal Practice ¶ 15.08 [4] (2d ed. 1968), and here the prejudice to Zenith would have been substantial. Zenith's theory that all of its damages suffered during the four-year period were legally recoverable had been made quite clear during the trial, and Zenith had proved up its damages in accordance with that theory. Meanwhile HRI had neither pleaded its defenses, objected to Zenith's evidence, nor otherwise hinted that post-1959 damages caused by pre-1959 conduct were for any reason barred until long after the record had been closed. To have then sustained HRI's defenses would have been to deny Zenith the opportunity to prove its recoverable damages—a denial that hardly comports with the letter or the spirit of Rule 15(a). At the very minimum, if the defense of limitations or release was to be entertained and deemed to bar that part of Zenith's damages resulting from the lingering consequences of past acts, Zenith would have been entitled to perfect its proof as to damage resulting from pool operations during the four-year period, as well as to prove, if it could, what damages it might have suffered in the future from those acts. To have per-

---

13. Because it was not clear from the record that the sole basis of the district court's rejection of the proffered defenses was that they were belatedly raised, the Court also reached their merits. Justices Harlan and Stewart, concurring, found it unnecessary to do so.

mitted Zenith to perfect its proof would, of course, have required reopening of the record and a virtual retrial of the issue of damages.

401 U.S. at 330–331, 91 S.Ct. at 802 (emphasis added).

Professor Moore notes:

The courts have shown "a strong liberality . . . in allowing amendments under Rule 15(a)." And in Foman v. Davis the Supreme Court strongly reaffirmed the mandate of Rule 15(a) that leave to amend shall be "freely given when justice so requires."

Recognizing that the entire spirit of the rules is to the effect that controversies shall be decided on the merits, the courts have not been hesitant to allow amendments for the purpose of presenting the real issues of the case, where the moving party has not been guilty of bad faith and is not acting for the purpose of delay, *the opposing party will not be unduly prejudiced, and the trial of the issues will not be unduly delayed.*

3 Moore's Federal Practice ¶ 15.08 [2] (2d ed. 1968) (emphasis added, footnotes omitted). And in Budd Co. v. United States, 19 F.R.D. 346, 349 (E.D. Pa.1956), Judge Van Dusen of this Court (now of the Court of Appeals) observed:

The most important factor in determining whether a motion for amendment of the pleadings should be permitted . . . is whether any prejudice will result to the opposing party in granting such a motion.

*Accord,* Chamberlin v. United Eng'rs & Constructors, Inc., 194 F.Supp. 647 (E. D.Pa.1961); Quinlan v. Matthews, 23 F.R.D. 25 (E.D.Pa.1958).

Our survey of the cases interpreting rule 15(a) has not persuaded us that a finding of prejudice to the opposing party, although dispositive when present, is the only factor justifying a refusal to permit a change in theory. Nor do we read Mr. Justice White as so holding, or at least as defining the notion of prejudice in narrow terms. In our view, the rules of procedure confer upon district judges broad discretion to determine what the "interests of justice" require, and permit us to consider, in making that determination, the orderliness of the proceedings before us and the integrity of the system of procedural rules. *See Eisenmann* and *Gaylord Shops, Inc., supra.* As we see it, a shift in theory should be denied, even in the absence of prejudice, where the party seeking to interpose it has been guilty of flagrant abuse, bad faith, or truly inordinate and unexplained delay. However, in the absence of these factors the question of prejudice should be the touchstone of the determination whether to permit the amendment.[14] Moreover, in approaching that question, we believe that we must view the notion of prejudice broadly and consider not only prejudice to Hupp's case, but also the substantial and wasted expenditure of Hupp's time and funds in preparing to meet claims abandoned as the result of the amendment, plus the increased difficulty at this late date of preparing defenses that might have been far easier to develop several years ago. While we believe that these latter factors can be alleviated by the imposition on Matlack of Hupp's wasted expenses (including counsel fees) in connection with the change in theory as a condition of per-

---

14. We footnote, to underscore, our agreement with the principle that amendments should be liberally permitted. There are many instances, for example, when amendments are the result of oversight. Lawyers, often parties to the oversight, are (like judges) both human and very busy, and we should never hesitate to allow amendments because of such a situation. In the text however we are discussing the types of situations which involve egregious conduct.

mitting its interposition,[15] that remedy does not necessarily, in the parlance of the instant case, "fill the bill." Finally, we note that discretion to permit a change in theory cannot be properly exercised in total disregard of the merits. See the concurring opinion of Mr. Justice Harlan in Zenith Radio Corp. v. Hazeltine Research, Inc., *supra,* where he stated:

I find it impossible to believe that the judge ruled thus summarily on the merits of the complicated issues of antitrust law to which this Court devotes 15 printed pages. I also find it highly unlikely that, without a word of explanation for departing from the sentiments he expressed during argument, the judge intended to forgive

Hazeltine's failure to raise the defenses earlier. *To be sure, he must have considered the merits sufficiently to satisfy himself that refusal to allow Hazeltine to raise these defenses worked no gross inequity.* See Fed. Rule Civ.Proc. 15(a). I remain convinced, however, that he rejected the defenses only as untimely raised.

401 U.S. at 354, 91 S.Ct. at 814 (emphasis added). Hence, our extended discussion of the merits in connection with our disposition of the summary judgment motion was not in vain.

█ Applying the principles just recited to the facts of this case, we find that Hupp has in its alternative motion pleaded a strong case for exercise of our discretion to strike the amended inter-

---

15. This court's power to allow counsel fees as a condition of granting leave to alter the issues derives from two sources. First, the allowance of counsel fees is one of the historic equity powers of the federal courts. Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). The award of counsel fees has been sanctioned by the Supreme Court when justice was found to compel such awards. *See, e. g.,* Vaughan v. Atkinson, *supra* (as an element of compensatory damages for recalcitrant refusal to pay a clearly meritorious claim); Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 426–428, 43 S.Ct. 458, 67 L.Ed. 719 (1923) (as part of the fine imposed for deliberate civil contempt); Sprague v. Ticonic Nat'l Bank, *supra* (when the plaintiff creates by litigation a common fund or precedent for the benefit of others as well as himself); *see* Lichtenstein v. Lichtenstein, 55 F.R.D. 535 (E.D.Pa. 1972) (counsel fees allowed in a suit to enforce a settlement agreement, where defendant was guilty of bad faith); Bernstein v. Brenner, 320 F.Supp. 1080, 1086 (D.D.C.1970) (as an element of *costs in a completely unfounded and unjustifiably protracted action).* Second, it is well settled that the court has power to avoid or minimize prejudice by allowing an amendment only upon fulfillment of reasonable conditions. 3 Moore's Federal Practice ¶ 15.08 [6] (2d ed. 1968) and cases cited at 935 nn. 1, 3; Strickler

v. Pfister Associated Growers, Inc., 319 F.2d 788 (6th Cir. 1963); Maynard, Merel & Co. v. Carcioppolo, 51 F.R.D. 273 (S.D.N.Y.1970); Parissi v. Foley, 203 F.2d 454 (2d Cir. 1953). This power derives from the language of rule 15(a) directing the court to grant leave to amend freely "when justice so requires." Where leave to amend would prejudice the other party but that prejudice is remediable, the quoted clause impliedly authorizes the imposition of conditions on the party seeking leave to amend. In Firchau v. Diamond Nat'l Corp., 345 F.2d 269, 275 (1965), the Ninth Circuit authorized the district court to "prescribe as a condition reasonable terms compensating appellee for any loss or expense occasioned by Firchau's failure to file adequate pleadings in the first instance." This is the procedure we believe is applicable here. Analogous support for this procedure is found in Smoot v. Fox, 353 F.2d 830 (6th Cir. 1965), cert. denied, 384 U.S. 909, 86 S.Ct. 1342, 16 L.Ed.2d 361 (1966), in which the court in dictum approved the conditioning of approval of a plaintiff's voluntary dismissal without prejudice under rule 41(a)(2) on the payment of defendant's counsel fees. We find this power applicable to the present case, for rule 16 ("Pre-Trial Procedure; Formulating Issues") and indeed the whole thrust of the procedural rules confer upon trial judges much power exercisable in equitable circumstances to further the interests of justice or prevent manifest injustice.

rogatory answers (or at the very least to impose costs and counsel fees as a condition of filing them). Hupp's specific allegations of prejudice in the form of deceased witnesses,[16] unavailable documents, dimmed memories, failure to explore defenses to a written warranty claim, and indeed of the knowledge all along by Matlack of the matters set forth in the amendment, are matters we see fit to explore further at a hearing on Hupp's motion to strike. This procedure was followed in Budd Co. v. United States, *supra*.

If Hupp can prove its allegations, it may indeed establish prejudice or the other criteria mentioned above which would merit the exercise of our discretion to strike the answers or impose costs, including counsel fees, as a condition of allowing them. At such hearing we will of course hear such further argument as Matlack may seek to advance which might affect the views heretofore expressed as to the merits, since in a gross sense, at least, they affect the exercise of equitable discretion. Matlack may, in the interim, file an answer or memorandum on the alternative motion (it has not done so to date). The hearing need not unduly delay the proceedings since it will be expeditiously held. We shall set the date therefor at a prehearing conference which we hereby fix for Tuesday, October 24, 1972 at 3:00 p. m. in Chambers.

In consideration of the foregoing, we enter the following Order:

And now, this 20th day of October 1972, it is ordered that:

1. Hupp's motions for summary judgment are denied;

2. Hupp's motion for a certification pursuant to 28 U.S.C. § 1292(b) is denied;

3. Hupp's alternative motion to strike Matlack's amended interrogatory answers on the ground that the claim therein asserted is barred by the statute of limitations is denied; and

4. The matters alleged in Hupp's alternative motion to strike Matlack's amended interrogatory answers shall be the subject of a hearing as set forth in the foregoing Opinion. A prehearing conference will be held on Tuesday, October 24, 1972 at 3:00 p. m. in Chambers.

---

16. Except with respect to Robert Matlack, of whose demise we are aware, see text accompanying note 11 *supra*.