**OUTBOARD MARINE CORP., a Delaware corporation, Plaintiff,**

**v.**

**PEZETEL, a Foreign Trade Organization of the People's Republic of Poland; Melex USA, Inc., a Delaware corporation; Defendants.**

**Civ. A. No. 77–51.**

United States District Court, D. Delaware.

March 29, 1982.

William O. LaMotte, III, and Lawrence A. Hamermesh, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff; Charles Owen Verrill, Donald A. Lofty and Peter J. P. Brickfield, Patton, Boggs & Blow, Washington, D. C., David J. Armstrong, M. Richard Dunlap and Susan K. Wright, Dickie, McCamey & Chilcote, Pittsburgh, Pa., of counsel.

James T. McKinstry, Richards, Layton & Finger, Wilmington, Del., for defendants Pezetel and Melex, U. S. A., Inc., Henry W. Sawyer, III, Stewart Dalzell and John Chesney, Drinker, Biddle & Reath, Louis B. Schwartz, Philadelphia, Pa., Carl Schwarz, Metzger, Shadyac & Schwarz, Washington, D. C., of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This opinion marks yet another milestone in the progress of this case through the federal courts. Plaintiff, Outboard Marine Corporation ("OMC"), filed the original complaint on February 14, 1977 alleging antitrust claims under sections one and two of the Sherman Act, 15 U.S.C. §§ 1, 2, violations of the Wilson Tariff Act, 15 U.S.C. § 8, and the Antidumping Act of 1916, 15 U.S.C. § 72. Defendants filed various motions to dismiss which were granted, in part, in an opinion issued September 27, 1978. *Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384 (D.Del.1978). Defendants Pezetel Foreign Trade Enterprise of the Aviation Industry ("Pezetel") and Melex USA, Inc. ("Melex") (hereinafter collectively referred to as "the Polish defendants") answered and filed a counterclaim on November 21, 1978. Plaintiff's motion to dismiss the counterclaim was filed on December 11, 1978, and the Court's Opinion granting the motion, in part, issued on June 22, 1979. *Outboard Marine Corp. v. Pezetel*, 474 F.Supp. 168 (D.Del.1979). Plaintiff filed a motion for summary judgment on the counterclaim on January 22, 1981. On April 30, 1981 the Polish defendants filed a

motion for leave to file an amended counterclaim which was granted June 15, 1981. On May 21, 1981 Pezetel and Melex filed a motion for summary judgment on the complaint and on June 30 plaintiff filed a motion for leave to amend.[1] Finally, on July 6 plaintiff filed a motion to stay the amended counterclaim pursuant to the doctrine of primary jurisdiction. Presently before the Court are plaintiff's motions to file an amended complaint and stay the amended counterclaim.

The factual background has been described at some length in the Court's two previously published opinions and will only be briefly summarized here. Plaintiff OMC is an American manufacturer whose subsidiary, Cushman, formerly manufactured gas and electric golf carts. In 1970 Elektrim began manufacturing an electric golf cart similar to one sold in the United States. Pezetel succeeded Elektrim as the Polish manufacturing entity in 1973 and created Melex, a wholly owned subsidiary incorporated in Delaware. It is alleged that in 1973 Melex carts accounted for seventeen percent of the United States electric golf cart market and thirty-five percent by 1975. It is further alleged that OMC went out of the golf cart business in 1975 because it was unable to meet Pezetel's prices. As noted, in 1977 OMC filed this suit alleging that the conduct of Pezetel, Melex and others violated various federal statutes.

*Amendment*

The fact that a plaintiff in a complex antitrust case seeks to amend its complaint five years after filing and in response to a motion for summary judgment is neither unusual nor surprising. Pezetel and Melex did precisely the same thing with their counterclaim a few months earlier. It is the interplay of the somewhat unusual factual background of this case and the legal theories sought to be added to the complaint which makes this case unique.

The principal change[2] in the amended complaint, other than the naming of three new Polish defendants, is the addition of a predatory pricing claim founded on allegations that Melex golf carts were sold at prices below cost. Although the proposed amended complaint nowhere specifies what cost is alleged, plaintiff's counsel represented to the Court at oral argument that after discovery plaintiff will be prepared to prove pricing below whatever cost is required by applicable case law, *i.e.*, they believe they will be able to prove Melex golf carts were sold below variable, fixed, total, marginal and incremental cost.[3]

As might be expected, defendants have opposed the proposed amendment, arguing that to permit it at this late stage in the proceedings would cause undue prejudice and delay. More troubling to the Court, however, is defendants' assertion that the amendment is proposed in bad faith in or-

1. Both the original complaint and the amended complaint named Fernclo Golf Car Company, Inc., Boylan Leasing, Inc., and Edditron, Inc. (United States distributors for the Polish defendants), in addition to Pezetel and Melex. The original complaint also named Ross Products, Inc., and the amended complaint names Elektrim, a Foreign Trade Organization of the Polish People's Republic ("Elektrim"), Industrial Group of the Aircraft and Diesel Engine Industry, an agency or instrumentality of the Polish People's Republic, and Wytwornia Sprzetu Komonikacyjnego Pzi-Mielec, an agency or instrumentality of the Polish People's Republic, *i.e.*, three more Polish entities. Since the date of oral argument the Court has been advised that settlement agreements have been reached with the United States distributors. Thus, at the present time, OMC, Pezetel, and Melex are the only parties before the Court.

2. Several counts in the amended complaint duplicate claims dismissed either by agreement or order of this Court. Counsel have represented that they were included solely for the sake of completeness with the expectation that with the exception of the antidumping claim they would be dismissed without further argument. As to the antidumping claim, counsel represented that they now believe they have sufficient evidence to cause the Court to reverse its earlier order of dismissal. However, based on the record and briefs before it, the Court is not prepared, in the context of a motion to amend, to reverse its earlier decision dismissing the antidumping claim. Plaintiff will be required to file a new amended complaint which omits those claims and parties which have previously been dismissed.

3. Transcript of October 19, 1981 oral argument at 9–10 (Docket No. 174).

der to evade an adverse determination on the merits and to continue to harass the defendants. After considering defendants' assertion in some detail, the Court has concluded that although their position is not totally without merit, plaintiff must be granted leave to amend.

The starting point, of course, must be Rule 15(a) of the Federal Rules of Civil Procedure, which provides in part that "a party may amend his pleading . . . by leave of court . . . and leave shall be freely given when justice so requires." The rule is now well established:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. —the leave should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). *Accord, Heyl & Patterson International, Inc. v. F. D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419 (3d Cir. 1981) (district court's granting leave to amend answer four years after filing of suit and after start of trial not reversible error).

Although such cases are rare and of necessity turn on their facts, bad faith has been relied upon to deny leave to amend. For example, in *Sterling Products Corp. v. Sterling Drug, Inc.*, 6 Fed.R.Serv. 386.12 case 4 (S.D.N.Y.1942), the plaintiff sought leave to amend three days before trial. The court specifically found that the amendment which would have stricken the claim for injunctive relief was proposed solely because the plaintiff wanted a jury trial to which it was not entitled. Similarly, in *Kuris v. Pepper Poultry Co.*, 2 F.R.D. 361 (S.D.N.Y.1941), defendant sought to amend its answer and incorporate, among other things, a counterclaim. The court found, based on plaintiff's unopposed affidavit, that defendant's allegation that its failure to amend previously was due to inadvertence and oversight was made in bad faith because plaintiff's attorney had informed defendant of the existence of an independent suit alleging the same cause of action a year earlier.

In *Matlack v. Hupp Corp.*, 57 F.R.D. 151 (E.D.Pa.1972), the court analogized to the Rule 15(a) cases and concluded that an evidentiary hearing was required to determine whether plaintiff's amended answers to interrogatories, filed over five years after the commencement of the action, should be stricken. The amended answers in *Matlack* had the effect of completely altering the legal theory of the plaintiff's case from one of oral warranty to one of written warranty. The court, concerned with the time and expense defendant had been forced to expend to defend against the now-discarded theory, and aware of the potential prejudice involved in allowing a change in theory necessitating new discovery eleven years after the transactions in issue, held that given the proper factual showing it had the power to order the amended interrogatory answers stricken or, in the alternative, impose costs and counsel fees as a condition of filing them. 57 F.R.D. at 164–65. In so doing the court did not concern itself with the plaintiff's ability to prove its newly stated legal theory, but with its delay in announcing it.

In each of these cases the court was concerned with the motivation of counsel in proposing a material alteration of their case in a late stage of the proceedings. As noted, this case has been in litigation for almost five years. At the time that the original complaint was filed and at oral argument in 1978, plaintiff argued vigorously that it was impossible to determine any Polish costs. At that time plaintiff urged this Court to adopt an alternative predatory pricing model for use in cases where it is alleged that a "defendant is an agency or instrumentality of a state-controlled economy in which it is impossible to arrive at a meaningful determination of

such costs...." [4] The Court declined to do so in its September 27, 1978 Opinion. *Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384 (D.Del.1978). That Opinion did not question plaintiff's assertion, which was backed by virtual unanimity of opinion,[5] that Polish costs are not determinable; it simply held that any such alternative model must be adopted by Congress rather than the courts. Now, four years later, OMC seeks leave to amend its complaint to allege predatory pricing based on allegations of below cost pricing, the very factual element whose impossibility of proof it urged as the justification for this Court to create a new legal theory in 1978.

It is to these facts that the Polish defendants point as evidence of bad faith. The Court shares some of defendants' skepticism as to plaintiff's ability to prove its predatory pricing claim, but the mere fact that a claim will be difficult to prove is not grounds to deny leave to amend. Defendants have been at pains to demonstrate that the factual underpinnings of plaintiff's assertions—that newly discovered evidence and the analysis of newly retained experts provide a good faith basis to believe that further discovery will enable them to establish the cost of producing Melex golf carts—are faulty and unworthy of consideration. Their effort makes it clear that plaintiff has set itself a difficult, indeed perhaps an impossible, task. However, at this stage of the proceedings it is not this Court's function to pass on the sufficiency of plaintiff's evidence. Despite defendants' considerable efforts, the Court is not convinced that plaintiff's explanation for its delay is nothing more than a sham. If, as defendants contend will be the case, plaintiff cannot prove Polish costs, they will be entitled to summary judgment at some later date. *See Prandini v. National Tea Company*, 62 F.R.D. 503 (W.D.Pa.1974).

Defendants have cited several instances in which courts have refused leave to amend on grounds of futility, and argue that they provide authority for this Court to prevent plaintiff's attempt to prove Polish costs. It is of course true that futility is a ground for denying leave to amend, but the line of cases cited involve futility as a matter of law. *See, e.g., Dixon v. Pennsylvania Crime Commission*, 67 F.R.D. 425 (M.D.Pa.1975) (jurisdictional defect); *Middle Atlantic Utilities Co. v. S.M.W. Development Corp.*, 392 F.2d 380 (2d Cir. 1968) (statute of limitations). In this case defendants, though conceding the legal sufficiency of plaintiff's claim, ask the Court to evaluate plaintiff's ability to prove it in the context of a motion for leave to file an amended complaint. In essence, defendants now urge the Court to do what they argued in 1978 it could not do—take judicial notice of the fact that in a state-controlled economy there is no way to measure cost.[6] The Court agrees with defendants' earlier position that such an issue is not an appropriate matter for judicial notice.

Defendants' remaining grounds for opposing plaintiff's proposed amendment can be disposed of quickly. The allegations of delay, prejudice and the disruption of the efficient administration of justice all rest at bottom on defendants' assumption that the predatory pricing claim will require extensive and time-consuming discovery. Assuming such allegations satisfy the stringent requirements of *Heyl & Patterson International, Inc. v. F. D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419 (3d Cir. 1981), at oral argument plaintiff's counsel represented to the Court that all discovery in this case could be completed in four months if its motion were

---

4. Letter of William O. LaMotte, III, Esq., to the Court, February 20, 1979, re issues for certification pursuant to 28 U.S.C. § 1292(b). Although, as defendants argue, plaintiff's earlier position casts considerable doubt on its present contention that Polish costs are determinable, the Court recognizes that neither the doctrine of *res judicata* nor collateral estoppel binds plaintiff to its earlier position. *See Gulf Oil*

*Corp. v. F.P.C.*, 563 F.2d 588, 595 n.6 (3d Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978).

5. *See, e.g.,* D. Wallace, Jr., G. Spina, R. Rawson, B. McGill, *Interface One* (1980).

6. Transcript of January 31, 1978 oral argument at 272–73.

denied and in six months if it were granted.[7] Given that representation, which the Court will embody in an order establishing a discovery termination date, the Court finds that the amendment will not cause defendants any substantial hardship.[8]

### Primary Jurisdiction

Plaintiff's second motion requests that pursuant to the doctrine of primary jurisdiction this Court stay all further proceedings on defendants' amended counterclaim until the Commerce Department and the International Trade Commission ("ITC") have an opportunity to resolve issues alleged to be within their respective fields of expertise. The allegations contained in defendants' counterclaim as well as the parties' contentions regarding the doctrine's applicability center about various proceedings under the Antidumping Act of 1921[9] concerning the importation of defendants' Melex golf carts from Poland. Although the parties disagree as to their proper characterization, the basic facts are not in dispute.

On June 11, 1975, the United States Treasury Department[10] concluded that "electric golf cars from Poland are being or are likely to be sold at less than fair value" in the United States within the meaning of the Antidumping Act of 1921. 40 Fed.Reg. 25497 (1975). As Poland is a state-controlled economy, the Treasury Department in making its determination was forced to rely upon a constructed value based upon prices in a market economy (Canada) rather than the prices charged in the home market. The matter was then considered by the ITC which concluded, based on the evidence before it, that the domestic industry was being injured by reason of the sales at less than fair value. The Treasury Department then entered a final antidumping order which required the payment of additional duties on the importation of Melex golf carts. Defendants' protest of that order was denied by the Treasury Department, and they have filed an action contesting the denial before the United States Court of International Trade.[11]

Although defendants' amended counterclaim alleges a number of theories of recovery, essentially it seeks redress for two related wrongs. Defendants allege that OMC conspired with certain other manufacturers to submit false information to the Treasury Department concerning the prices of Canadian golf carts manufactured by Marathon Golf Car, Ltd., "in order to create the false impression that Melex golf carts were being sold in the United States at less than their

---

7. Transcript of October 19, 1981 oral argument at ·129–30.

8. Defendants also raise several objections to plaintiff's addition of the three new Polish defendants. They argue both that the newly joined defendants will be under no obligation to agree that discovery taken in their absence can be used against them, that the statute of limitations has run as to OMC's claims against them, and that the complaint's allegations of fraudulent concealment are insufficient to toll it as a matter of law. As to the latter objection, it should be noted that the statute of limitations may be waived. Inasmuch as the additional defendants are not before the Court, it is impossible to know at this point whether the defense will even be raised. The ground upon which defendants may raise the former objection is that duplicative discovery will cause them delay and additional expense. In imposing a six-month discovery cutoff, the Court has already given them some protection against duplicative discovery. In addition, plaintiff's leave to amend will be conditioned on defend-

ants' right to apply for an award of attorneys' fees and expenses to compensate them for duplicative discovery not initiated by defendants which is necessitated by the amendment.

9. Formerly 19 U.S.C. § 160 *et seq.*, the antidumping provisions now appear as part of the Tariff Act of 1930, 19 U.S.C. § 1671 *et seq.*

10. The Trade Agreements Act of 1979, 19 U.S.C. § 1671 *et seq.*, authorized transfer of the Treasury Department's antidumping responsibilities to other federal departments. Pursuant to President Carter's Reorganization Plan No. 3 of 1979, 44 Fed.Reg. 69273 (December 3, 1979), Treasury's antidumping responsibilities were transferred to the Commerce Department effective January 2, 1980. It is for that reason that plaintiff's motion requests a stay pending resolution of certain matters by the Commerce Department rather than the Treasury Department.

11. *Melex U.S.A. v. United States*, No. 81–4–00397 (complaint filed April 14, 1981).

fair value."[12] Defendants also allege that OMC falsely represented to the ITC that "OMC was forced out of the golf cart business and forced to discontinue the production and distribution of its Cushman golf cart line because of competition from Melex golf carts..." when in fact OMC's decision was the product of factors other than competition from Melex golf carts.[13]

The parties' disagreement focuses on the characterization of defendants' allegations. Plaintiff contends that the counterclaim arises out of various proceedings under the Antidumping Act of 1921 and that proceedings in the Court should be stayed pending initial consideration by the agencies involved. Defendants argue that the counterclaim focuses on the wrongful conduct of OMC, some of which happened to occur in the course of the antidumping proceedings. More specifically, defendants argue that not only was OMC's conduct during the proceedings wrongful, but its action in bringing the proceedings in the first instance was wrongful.

■ The doctrine of primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956). It comes into play whenever a claim originally cognizable in the courts requires the resolution of issues which have been placed within the special competence of an administrative body. "[I]n such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Id.* at 64, 77 S.Ct. at 165. The doctrine has traditionally been applied in two distinct situations: when uniformity of regulation is appropriate; and when there is a need for an initial consideration of the problem by a tribunal with specialized knowledge. *Kappelmann v. Delta Air Lines, Inc.*, 539 F.2d 165, 169 (D.C.Cir.1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977); *Consolidated Rail Corp. v. City of Dover*, 450 F.Supp. 966, 973 (D.Del.1978).

Defendants raise three principal objections to the doctrine's application to their counterclaim. First, they argue, the issues to be addressed do not require the utilization of any special knowledge or agency expertise. Rather, they argue, the issues involved—bad faith, perjury, and reliance—are within the courts' traditional competence. Defendants' second argument, which may in some ways be considered a subcategory of the first, is that the agencies involved have changed personnel and their opinions as to the effect of the allegedly wrongful conduct occurring in 1975 would therefore be of little value to the Court. Defendants' third argument focuses on the procedural posture of the case and urges that in the exercise of its discretion the Court should deny the stay.

*Expertise*

■ Defendants' primary argument is that the counterclaim focuses on two categories of wrongful acts—the bad faith institution of agency proceedings and the knowing presentation of false information—which do not implicate the twin policies of uniformity and utilization of agency expertise underlying the doctrine. It is of course true that issues of bad faith and perjury are routinely addressed by the courts. As defendants conceded, however, as it relates to the antidumping proceedings, the counterclaim raises three issues: whether OMC initiated the proceedings in bad faith; whether false statements were made to the agencies involved; and whether the agencies relied upon these false statements.[14] The mere fact that the resolution of these

---

12. Amended Counterclaim of Defendants Pezetel and Melex USA ("counterclaim") at 6.

13. Counterclaim at 7. Although not the focus of the present motion, the amended counterclaim also alleges that OMC conspired to engage in a joint program of threatened litigation and publicity in order to discourage distribu-

tors from selling and potential customers from buying Melex golf carts. Counterclaim at 12–13.

14. Brief of Defendants Pezetel and Melex USA, Inc., in Opposition to Plaintiff OMC's Motion to Stay the Amended Counterclaim, Docket No. 153 at 4–5.

ultimate issues may be within the traditional competence of the courts does not end the matter. The doctrine may apply "even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be legally defined." *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952); *accord, MCI Communications Corp. v. American Telephone & Tel. Co.*, 496 F.2d 214, 223 (3d Cir. 1974). The doctrine's goals are furthered even though the agency's review is limited to "ascertaining and interpreting the circumstances underlying the legal issues . . . ." *Far East Conference v. United States*, 342 U.S. 574–75, 72 S.Ct. at 494.

■ Defendants' allegation that OMC instituted the antidumping proceedings in bad faith, though simple on its face, will necessitate an examination of the factors considered by the agency in evaluating claims of less than fair market sales under the Antidumping Act of 1921. Those factors can hardly be considered nontechnical as evidenced by the fact that the Treasury Department had to construct an artificial fair value for defendants' golf carts based on Canadian prices. Similarly, in determining the probability of injury to the domestic market the ITC must consider

> such economic factors as import penetration in the U.S. market, domestic industry production and sales in the United States, price suppression or depression in the U.S. market, employment, profits, and capacity utilization in the U.S. industry, and other factors bearing on the state of [the] U. S. industry.

S.Rep.No. 96–249, 96th Cong., 1st Sess. 86 (1979), *reprinted in* [1979] *U.S.Code Cong. & Ad.News* 381, 472.

In *Alberta Gas Chemicals, Ltd., v. Celanese Corp.*, 650 F.2d 9 (2d Cir.1981), the Court of Appeals for the Second Circuit, presented with a strikingly similar factual situation, held that a stay was appropriate. The plaintiff in *Alberta* alleged that the defendants had perpetrated a scheme to defraud and unfairly compete with the plaintiff by interfering with its efforts to sell methanol, an organic chemical, in the United States. As summarized by the Second Circuit, the gravamen of the complaint was that the defendant had presented false testimony for consideration during the ITC's determination of injury or likelihood of injury to the domestic market. 650 F.2d at 10. Thus, as in this case, the court was presented with a claim that a party before it had sought to unlawfully injure another party's business, in part, by committing perjury before the ITC. The court recognized that the ITC was in the best position to determine, in the first instance, whether there was perjury and if so whether it affected the result before the ITC.

Similarly, in the instant case it is clear that the ITC's expertise will be helpful in determining whether OMC's testimony concerning the effect of the importation of Melex golf carts was truthful. In addition, as the court pointed out in *Alberta*, the ITC is in a much better position than this Court to evaluate the impact of OMC's allegedly perjured testimony on its decision making process. Although the ITC was the only agency involved in *Alberta*, its rationale is equally applicable to the Treasury Department here. Both the truthfulness and the importance to the agency's decision of the information concerning Canadian golf carts are matters on which this Court's decision would be materially aided by the agency's knowledge and expertise concerning less than fair market evaluations.

Defendants argue that the subsequent history of the *Alberta* case demonstrates that reference to the ITC would be inappropriate. The Court cannot agree. In *Alberta* the ITC declined to act on plaintiff's petition; however, in its August 20, 1981 opinion letter, the ITC explained that during the intervening period the United States Court of International Trade had reversed the contested determination. Given the fact that the ITC had decided not to appeal that judgment, it thought there was no need to reopen the matter to decide, albeit on new grounds, the correctness of what had already been determined to be an erroneous decision. The ITC recognized the

importance of protecting the integrity of its proceedings but concluded that because the matter could no longer affect a live controversy within its jurisdiction, it should be referred to the Justice Department for investigation. In contrast, in this case defendants' appeal is still pending before the United States Court of International Trade and the findings of the Treasury Department and the ITC remain undisturbed. Based on this record the Court is not willing to conclude that neither agency would be willing to investigate defendants' allegations.

*Personnel*

■ Defendants argue that the fact that both agencies are composed of different personnel today from those who presided over the antidumping proceeding of 1975 precludes this Court from relying on their expertise. The ITC is now composed of entirely different commissioners from those serving in 1975. Moreover, the Treasury Department's duties in antidumping proceedings have since been transferred to the Commerce Department. Thus, defendants argue, these agencies can provide little or no assistance to the Court in evaluating their claims. This argument overlooks the essential nature of the agency process which primarily relies not on individual decision making but the interaction of commissioners and staff. Indeed, given the practical realities of litigation and the turnover rate of agency personnel, adoption of defendants' argument would result in the virtual elimination of the doctrine of primary jurisdiction. Taken to its logical extreme defendants' argument would require a court to examine an agency's personnel records to determine its level of experience before deciding the doctrine's applicability. Such a procedure has no support in the law.·

*Discretion*

■ Defendants contend that even if the doctrine of primary jurisdiction were applicable to the general facts of this case, given its current posture, the Court should, in the sound exercise of its discretion, decline to grant the stay. A comparison of the facts of this case with those of *United States v. Manufacturers Hanover Trust Co.*, 240 F.Supp. 867 (S.D.N.Y.1965), the only case the Court or counsel have discovered in which a court exercised its discretion to deny a stay when the doctrine of primary jurisdiction was otherwise applicable, will demonstrate why such an exercise would be inappropriate here. In *Manufacturers Hanover Trust*, which involved a challenge to a bank merger under the antitrust laws, a trial on the merits and post-trial briefing had been completed in 1962. Subsequent Supreme Court decisions led to additional briefing and two rounds of supplemental evidentiary submissions in 1963 and 1964. It was thus in the context of a case which had been tried on the merits in 1961 that the *Manufacturer Hanover Trust* court concluded in 1965 that relegation of the matter to an agency would "serve no useful purpose and defeat the ends of justice." 240 F.Supp. at 882. Although the instant case was filed in 1977, it unfortunately has not progressed beyond the discovery/summary judgment phase. Thus on the facts of this case the Court is not prepared to hold that referral to the Commerce Department and the ITC would either be futile or defeat the ends of justice.

*Conclusion*

Plaintiffs will be permitted to file an amended complaint adding three new Polish defendants and a predatory pricing claim. Plaintiff will not be permitted to file a complaint which incorporates, for whatever reason, claims or parties which have previously been dismissed other than the predatory pricing claim. Plaintiff's leave to amend will be conditioned on the Polish defendants' right to apply for an award of attorneys' fees and expenses against OMC in the event that the adding of three additional defendants occasions duplicative discovery not initiated by Pezetel or Melex. In addition, defendants' amended counterclaim will be stayed and a six-month termination of discovery date will be established.

An appropriate order will issue.